# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 1, 2009

## STATE OF TENNESSEE v. TARRENCE PARHAM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00017     W. Otis Higgs, Jr., Judge**

___

**No. W2009-00709-CCA-R3-CD  - Filed July 26, 2010**

___

The defendant, Tarrence Parham, stands convicted of attempted second degree murder, a Class B felony, and reckless aggravated assault, a Class D felony.  The trial court sentenced him as a Range II multiple offender to an effective sentence of twenty years in the Tennessee Department of Correction.  On appeal, the defendant challenges (1) the trial court's admission of his prior conviction of reckless homicide for impeachment purposes and (2) the sufficiency of the evidence.  Following our review of the parties' briefs,[1] the record, and the applicable law, we affirm the judgments of the trial court as modified to reflect that the defendant's conviction for reckless aggravated assault is merged into his conviction for attempted second degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
as Modified and Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Lance R. Chism (on appeal and at trial) and Claiborne Ferguson (at trial), Memphis, Tennessee, for the appellant, Tarrence Parham.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

___

[1]  The defendant filed a reply brief in this matter, disputing the state's contention that photographs of the crime scene were not contained within the appellate record.  We note that the appellate record does include the crime scene photographs.

## OPINION

### Background

In January 2006, a Shelby County grand jury indicted the defendant, Tarrence Parham, for the attempted first degree murder of M.S.,[2] a Class A felony, and the aggravated assault of M.S., a Class C felony. The parties presented the following evidence at the July 14 to 17, 2008, trial.

Shamika Nabors testified that on September 5, 2005, Labor Day, she was among a group of people congregating outside their apartments at the Barron Brook Apartments in the Orange Mound neighborhood of Memphis, Tennessee. The defendant, whom she called "Black," was also outside, and she heard him say that he was going to kill "these weak ho's and b----es[.]" At first she thought he was speaking to himself, but as she watched him, she realized that he was looking at a man named Philemon, who was sitting in a windowsill in the breezeway. Ms. Nabors pulled Philemon into her apartment and told him what the defendant had said. Then, they returned outside, and Philemon resumed his seat on the windowsill. Five to ten minutes after she and Philemon returned, the defendant walked away and then returned. He raised a silver revolver and fired one shot down the breezeway and two shots in the park area nearby. Ms. Nabors saw Philemon run down the breezeway towards the laundromat and leave the apartments. Ms. Nabors testified that the defendant fired the first shot toward a utility box. She later learned that her two-year-old daughter had been near the box when the defendant began shooting. Ms. Nabors testified that she froze when the defendant began shooting. After the last shot, the defendant left the apartments, and M.S. ran for her mother. Ms. Nabors saw that the defendant had shot M.S. in the leg. She did not know where M.S. was when she was shot, but she identified pictures of the green box with blood on it. She identified the defendant as the shooter in a photographic lineup when she gave her statement to police and in the courtroom during her testimony.

Ms. Nabors testified that she did not see or hear anyone threaten or fight with the defendant prior to the shooting. She did not see anyone else with a gun nor did she see anyone "raise up their shirt at [the defendant.]" Ms. Nabors said that Philemon was neither facing the defendant nor did he have his back to the defendant when the defendant began firing, but after the first shot, Philemon ran away. She did not see a young man give the defendant a gun. Ms. Nabors testified that no one shot back at the defendant. She recalled that several of the men in the group were smoking marijuana, including Philemon, but she did not hear the defendant say anything about the marijuana.

---

[2] M.S. was eight years old at the time of the offense and eleven years old at the time of trial. It is the policy of this court to refer to minor victims by their initials.

On cross-examination, Ms. Nabors testified that there were approximately fifteen people outside that day. She said that she had seen the defendant and Philemon together before. She saw the defendant in a wheelchair several days before the shooting, but she said he was not in a wheelchair that day. His leg was bandaged, and it was difficult for him to run. Ms. Nabors testified that the defendant ran in the same direction as Philemon. She said that Philemon did not live in the apartment complex.

On re-direct examination, Ms. Nabors testified that she believed the defendant was shooting at Philemon.

Tosha Keller testified that on September 5, 2005, she and her family and friends were gathered outside of her apartment preparing for a barbecue. A man named Philemon was sitting in the window of an apartment unit, rolling a marijuana cigarette, when the defendant approached him. Ms. Keller said that the defendant "said some things to Philemon. Philemon just kept on doing what he was doing." She heard another man tell the defendant "that he couldn't smoke the marijuana cigar." Ms. Keller did not see anyone threaten or yell at the defendant. The defendant walked down to the end of the apartment unit, but three to five seconds later, he returned and began shooting. Ms. Keller was standing five feet away from Philemon, and she believed that the defendant aimed at him. She testified that the defendant fired one shot before Philemon began running away. The defendant chased after him and fired two more shots. After Philemon and the defendant ran out of her sight, she heard two more shots. Ms. Keller testified that the defendant fired a total of five shots, three that she saw and two that she heard. Ms. Keller assumed that the defendant fired the shots that she heard because no one was returning fire. She said that she did not see anyone else with a gun that day. Ms. Keller testified that she remembered the gun being black, but she agreed that her memory was better on the day of the shooting when she gave a statement to the police that the gun was a chrome revolver.

Ms. Keller testified that after the shooting, she and her neighbors were trying to find the children that had been playing near the laundromat. She had seen M.S. running when the shooting began, but M.S. went back to get Ms. Nabors's two-year-old daughter, with whom she had been playing. When the shooting was over, Ms. Keller saw M.S. walking towards her carrying the two-year-old. M.S. said that she was hurting, and Ms. Keller realized that she had been shot in the leg.

Ms. Keller testified that the defendant moved into the apartment complex two to three months prior to the shooting. She said that "it was chaos" after he moved in. She recalled seeing him in a wheelchair, with casts on his legs, for a period of approximately two weeks. Ms. Keller testified that on September 5, the defendant did not have casts and appeared able-bodied. She said that she knew that someone had shot at the defendant's apartment because

she saw the bullet holes in the door the next day, but she did not testify as to what exact day she saw the bullet holes.

On cross-examination, Ms. Keller testified that she could not remember the color of the gun. She remembered telling the police that she saw the defendant shoot once and then heard another shot, but she believed that he shot more than twice. Ms. Keller said that she saw another man walking with the defendant, but she did not know him. She said that the man was not M.S.'s uncle. Ms. Keller clarified that she saw the bullet holes in the defendant's apartment door on September 6, 2005, the day after the shooting. She recalled that there were seven to eight adults outside on September 5, and she did not remember how many children were on the playground nearby.

Sharon Williams testified that the defendant, whose nickname was "Black," moved into the Barron Brook apartment complex two to three months before the shooting on September 5, 2005. On that day, she was outside with her neighbors when she heard the defendant say "he [was tired] of them and he [was] going to kill him a mother f---ing n----r" as he was walking towards the end of the apartment unit. Less than a minute later, the defendant turned around and began shooting. Ms. Williams testified that he fired once, chased after a young man, and fired twice more. She said the gun was a silver revolver. Ms. Williams did not see anyone threaten the defendant nor did she see the young man who the defendant chased ever lift up his shirt or draw a weapon.

Ms. Williams said that someone shot at the apartment where the defendant was staying one to two weeks before September 5, 2005. She heard him say that "[h]e had got into it with some guys over there[,] and they had shot somebody else's apartment up looking for him." A couple of nights before the September 5 shooting, the defendant was in a wheelchair with soft casts on his feet. Ms. Williams had heard that the defendant was injured when he jumped from a second story. Ms. Williams testified that the defendant said that he did not care who he shot, "[h]e [would] kill your momma, your grandmomma, babies and kids, because they don't even have no [sic] business in the way whatsoever." Ms. Williams testified that on September 5, there were five to six people outside. She said that if Philemon had drawn a weapon, she would have seen it.

Kathy Smith testified that on September 5, 2005, she was standing in her doorway while her neighbors were barbecuing outside. The defendant asked her for a cigarette. She gave him one, which he lit. As he walked away, he said, "I'm sick of these b---h a---ed n-----s. I'm going to kill me somebody today." The defendant turned around and started shooting as he walked by her. Ms. Smith told him to stop shooting because of all the children outside. She started calling for her daughter. When she saw M.S., she was bleeding. M.S. said, "[M]omma, I don't want to die."

-4-

Ms. Smith testified that her brother, Travis, was not at the apartment complex when the defendant began shooting. He came later that day, after M.S. was in an ambulance. She said that she did not see anyone threaten the defendant, raise up their shirts, or shoot back at the defendant. Ms. Smith went to the hospital with M.S., where the doctors performed surgery to remove a bullet from her left leg.

On cross-examination, Ms. Smith testified that she did not know where the defendant had gotten the gun. She said that he did not go into an apartment when he was walking away from the crowd nor was he walking with anyone else. She saw the defendant fire two shots before he went out of her sight. Ms. Smith said that he was limping.

M.S. testified that she was eleven years old at the time of trial. On September 5, 2005, she had been playing with Ms. Nabors's two-year-old daughter. They were sitting on "the green box" when she heard the shooting. She ran into the laundromat but then went back to the green box and moved her friend out of the way. At that point, M.S. thought that she had a seizure, which she defined as what happens when people are shaking. She began walking towards her mother when she looked down and saw that she was bleeding. She went to the hospital where doctors removed the bullet. M.S. said that she could run and play at the time of trial.

On cross-examination, M.S. said that she saw the shooter but did not see him well.

Officer Parz Boyce, of the Memphis Police Department, testified that he was one of the first officers to make the scene at the Barron Brook Apartments on September 5, 2005. When he arrived, he saw a five or six-year-old girl[3] lying on the steps with a bloody towel. Officer Boyce said the girl told him that "Black" had shot her. He knew who "Black" was based on his experience working in the neighborhood. Two other individuals also told him that "Black" was the shooter and gave him descriptions of his clothing. Officer Boyce put out a broadcast giving the name and description of the shooter. He and another officer taped off the crime scene.

On cross-examination, Officer Boyce testified that he knew the defendant as "Black," and the defendant was the only person he knew that went by that nickname. In the course of gathering information, he learned that M.S. was not the intended victim, but he was unable to ascertain who the intended victim was.

---

[3] The record indicates that M.S. was eight years old at the time.

The parties stipulated to the admission into evidence of a bloody towel, M.S.'s sandal, and a pair of sunglasses collected by a crime scene officer at the Barron Brook Apartments. They further stipulated to the admission into evidence of the bullet recovered from M.S.'s leg.

Officer Ravell Slayton, of the Memphis Police Department, testified that he made the scene at the Barron Brook Apartments on September 5, 2005. He received information that the shooter had fled on foot, wearing a red shirt and white shorts, and he left the scene to search for the shooter. Officer Slayton learned that the shooter had jumped into a black pickup truck. He located a suspicious black truck and pulled it over. The driver admitted that he had dropped the shooter off at a laundromat at Lamar Avenue and Semmes Street. Officer Slayton remained with the driver while his partner went to the laundromat. When his partner returned, the defendant was in the backseat of the patrol car. Officer Slayton identified a picture of the defendant wearing a red shirt and white shorts, with "old cast[s]" around his ankles.

Sergeant Vernon Vanburen, of the Memphis Police Department, testified that he processed the crime scene at the Barron Brook Apartments. He did not find a weapon.

The defendant testified that he had prior convictions for reckless homicide, theft over $500, and aggravated burglary. He said that he moved to the Barron Brook Apartments one and a half months before September 5, 2005. He moved there because he had "kin folks" in the neighborhood, but some of the men in the apartment "had words" with him about staying there when he was not from the neighborhood. The defendant testified that on either August 26 or 28, 2005, he broke both of his feet. The personnel at the Regional Medical Center gave him temporary casts and pain medication. He had to use a wheelchair to get around. On August 31, someone fired shots at his apartment. He filed a police report, but the police did not find who did it. By September 5, 2005, he could walk but not run.

The defendant testified that on that day, he was walking to his apartment when he saw Philemon, one of the men with whom he had previously "had words" and who he believed was responsible for shooting his apartment. The defendant said he "was already paranoid" because of the August 31 incident. He claimed that he did not say anything about killing anyone, but Philemon said that he "was going to kill one of these 'B's or H's' or something like that." The defendant asked him to whom was he speaking, and Philemon "jumped up" and reached under his shirt. The defendant believed that Philemon was reaching for a weapon, so he fired one shot towards him. The defendant said that he was not trying to kill Philemon, but he was protecting himself. He explained that he immediately reacted, contrary to the other witnesses' testimony that several minutes passed. When Philemon ran away, the defendant was afraid he would return, so he went to the laundromat at Lamar Avenue and

Semmes Street because he knew the owners. He did not realize that he had shot anyone until the police officer picked him up at the laundromat. The defendant admitted that he told the police that he had thrown the gun into a garbage can on Semmes Street. He said that he actually returned the gun to the person from whom he had gotten it, Kathy Smith's brother, Travis.

On cross-examination, the defendant testified that Travis Smith[4] gave him the gun approximately two hours prior to the shooting, and the defendant returned it to him immediately after he fled from the scene. He said that he did not call the police to report that he had shot at someone in self-defense because the police did not help him when he called them about someone shooting at his apartment.

The state called Travis Lloyd Alston as a rebuttal witness. Mr. Alston testified that he was Kathy Smith's brother. He said that he did not give the defendant a gun on September 5, 2005. He further said that he would not have allowed the defendant to give him the gun with which the defendant had shot his niece. Mr. Alston said that "[he] would have retaliated" against the defendant. Mr. Alston knew the defendant only as "Black." He said that if they had been friends, he would have known the defendant's full name.

Following deliberations, the jury found the defendant guilty of the lesser-included charges of attempted second degree murder, a Class B felony, and reckless aggravated assault, a Class D felony. The trial court sentenced the defendant as a Range II multiple offender to twenty years for the Class B felony concurrent with ten years for the Class D felony, to be served in the Tennessee Department of Correction. The trial court denied the defendant's motion for new trial, and the defendant filed a timely notice of appeal.

**Analysis**

*I. Admission of Prior Reckless Homicide Conviction*

On appeal, the defendant argues that the trial court erred by admitting the defendant's prior reckless homicide conviction for impeachment purposes and that the error was prejudicial. Furthermore, the defendant contends that the trial court's failure to make explicit findings requires this court to review the court's ruling without deference. The state responds that the defendant has failed to show that the trial court abused its discretion. We agree with the defendant that the admission of the prior conviction was error but conclude that the error was harmless in light of the evidence against the defendant.

---

[4] We assume the defendant was referring to Travis Alston.

We analyze whether a trial court erred in admitting prior convictions for impeachment purposes under an abuse of discretion standard. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). "A trial court abuses its discretion only when it 'appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Id.* (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999))

Rule 609 of the Tennessee Rules of Evidence permits the defendant's credibility to be impeached by prior criminal convictions on cross-examination if certain conditions and procedures are satisfied. The conviction must be for a crime (1) punishable by death or incarceration in excess of one year, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). The state is also required to give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the defendant. Tenn. R. Evid. 609(a)(3). Before permitting the use of a prior conviction, the trial court must find that the probative value of the conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. *Id.* Generally, convictions that are ten years old or more cannot be used for purposes of impeachment. Tenn. R. Evid. 609(b). If the prior convictions do not qualify under Rule 609(b)'s time limitation, the state has given adequate notice, and the defendant has had the opportunity to contest the use of the convictions, then the trial court must "determine[] in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, *substantially* outweighs its prejudicial effect." Tenn. R. Evid. 609(b) (emphasis added). The trial court shall rule on the admissibility of the prior conviction before the defendant testifies. *Id.* If the court rules that the prior conviction is admissible to impeach, there is no requirement that the defendant testify at trial in order to later challenge the court's ruling on the admissibility of the prior conviction. *Id.*

"The mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). However, "[w]hen an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999) (citations omitted). Accordingly, trial courts should engage in a two-prong analysis when determining if the probative value of the impeaching conviction is outweighed by its prejudicial effect. *Id.* Trial courts are required to expressly (1) "analyze the relevance the impeaching conviction has to the issue of credibility," as well as (2) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id.* (citations omitted). If the trial court fails to engage in an explicit analysis under *Mixon*, then "the court's decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court. .

-8-

. [W]e must independently determine the admissibility of the prior impeaching conviction based on the evidence presented." *State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008).

> In the case *subjudice*, the trial court ruled as follows:
> Now, I'm going to allow the State to ask [the defendant] about these three convictions,[5] not as to the facts. But simply, are you the same [person] that was convicted on these matters.
>
> I must tell you for the record, and I want the record to properly reflect this. I don't know what the reckless homicide is about.
>
> I'm simply ruling that he can be asked about a D-felony conviction of reckless homicide.
>
> I will charge the jury, as usual, that they are not to consider that conviction for purposes of determining his innocence or guilt in the case at trial.
>
> But reckless homicide does raise . . . the issue of [the jury] might [think] well, if he was convicted of reckless homicide in the past, he may very well be guilty of this.
>
> But I'm going to tell them not to do that. I don't know how effective that charge is.
>
> But on its face, I'm going to allow [the state] to ask, without any inquiry into the facts.
>
> However, I'm going to reserve - - I'm going to listen carefully, and hopefully the defendant doesn't open the door if he chooses to testify.
>
> But I'm going to allow him to be asked about those previous convictions.

The trial court did not make an explicit finding regarding the relevance of the reckless homicide conviction to the defendant's credibility nor did it assess the similarity between

---

[5] The defendant does not challenge the admission of his prior convictions for theft over $500 and aggravated burglary.

reckless homicide and the charged offenses, beyond merely acknowledging the possibility that the jury would consider the conviction to be propensity evidence. Therefore, we conclude that the trial court's ruling is not entitled to deference by this court. *See Lankford*, 298 S.W.3d at 182.

The defendant's reckless homicide conviction was punishable by "imprisonment in excess of one year," his release from confinement occurred within ten years of the commencement of the prosecution in this case,[6] and the state gave reasonable notice of its intent to impeach him with the conviction. *See* Tenn. R. Evid. 609(a)-(b). Under *Mixon*, this court must determine whether the probative value of the conviction on the defendant's credibility outweighs the prejudicial effects by (1) "analyz[ing] the relevance the impeaching conviction has to the issue of credibility," as well as (2) "assess[ing] the similarity between the crime on trial and the crime underlying the impeaching conviction." *Mixon*, 983 S.W.2d at 674.

In this case, the defendant's credibility was at issue because he testified in his own defense; therefore, any evidence regarding his credibility was probative. However, the defendant's credibility was not crucial to the state's case because of the nature of the evidence against him. The state argues that reckless homicide is a crime of violence and, as a violent felony, was probative of the defendant's credibility. We decline, however, to characterize reckless homicide as a crime of violence because it requires reckless conduct rather than intentional or knowing conduct. *See United States v. Portela*, 469 F.3d 496, 499 (6th Cir. 2006) (holding that Tennessee's vehicular assault statute, with the requisite *mens rea* of recklessness, was not a crime of violence under the United States Sentencing Guidelines). Because the defendant's reckless homicide conviction was not a violent felony, we decline to weigh it more heavily against his credibility than other non-violent felonies.

In this matter, the charged offenses of criminal attempt to commit first degree murder and aggravated assault were similar to the defendant's prior conviction. Reckless homicide is the "reckless killing of another" while first degree murder is the "premeditated and intentional killing of another." Tenn. Code Ann. §§ 39-13-202, -215. Criminal attempt requires the defendant to act with the same culpability as the specific offense. *Id.* § 39-12-101. The impeaching conviction and the charged offense of attempted first degree murder are similar in that they are both offenses against the person involving the "killing of another." *Id.* §§ 39-13-202, -215. Aggravated assault is the intentional, knowing, or reckless commission of an assault that causes serious bodily injury or is accomplished through the use or display of a deadly weapon. *Id.* § 39-13-102. Assault, as relative to this case, is

---

[6] The state's notice of impeachment convictions lists the date of conviction as November 10, 1998. The record does not reveal when the defendant was released from confinement.

intentionally, knowingly, or recklessly causing bodily injury to another. *Id.* § 39-13-101(a)(1). Aggravated assault and reckless homicide are similar because they may involve the same mental state and are offenses against the person. Because of the similarity between the charged offenses and the defendant's prior conviction, we conclude that "there [was] a danger that jurors [would] erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he . . . is probably guilty of the offense charged." *Mixon*, 983 S.W.2d at 674. Therefore, the trial court committed error by admitting the prior conviction for impeachment purposes.

Nonetheless, the trial court's error was harmless. When undertaking a harmless error analysis, this court must consider whether "an error more probably than not had a substantial and injurious impact on the jury's decision-making." *State v. Rodriquez*, 254 S.W.3d 361, 372 (Tenn. 2008). Here, the trial court admonished the jury that the defendant's prior convictions were not evidence that he committed the charged offenses, and "the trial court's limiting instruction 'provided an adequate safeguard against any potential prejudice possibly engendered by the admission of the prior conviction.'" *See Lankford*, 298 S.W.3d at 182 ( quoting *United States v. Moore*, 917 F.2d 215, 234-35 (6th Cir. 1990)). Additionally, under the facts and circumstances of this case, the admission of the prior conviction, more probably than not, had a minimal impact on the jury's decision-making because of the overwhelming evidence against the defendant, including the testimony of four eyewitnesses. Therefore, we conclude that the trial court's error in admitting the prior conviction was harmless. The defendant is without relief as to this issue.

## II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to support his convictions for attempted second degree murder and reckless aggravated assault. Specifically, he contends that the state failed to prove beyond a reasonable doubt that he was not acting in self-defense. The state responds that the jury discredited the defendant's theory of self-defense and that the evidence was sufficient to support the defendant's convictions.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor

of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

At trial, the state carried the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense because the defendant's testimony fairly raised the issue. *See* Tenn. Code Ann. § 39-11-203 (West 2005). At the time of the offenses, the statute on self-defense provided, in relevant part:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

*Id.* § 39-11-603(a) (West 2005). The claim of self-defense is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Second degree murder is "[a] knowing killing of another." *See* Tenn.Code Ann. § 39-13-210(a)(1). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." *Id.* § 39-11-302(b). "[A] result-of-conduct crime does not require as an element that an actor engaged in a specified course of conduct accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Criminal attempt is statutorily defined as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101. Whether the defendant "knowingly" attempted to kill the victim is a question of fact for the jury. *See State v. Inlow*, 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000). Intent may be inferred by the trier of fact from the character of the assault and from all the facts and circumstances surrounding the offense. *See Inlow*, 52 S.W.3d at 105 (quoting *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

To obtain a conviction for reckless aggravated assault the state had to prove that the defendant recklessly committed an assault as defined below and caused serious bodily injury to another; or used or displayed a deadly weapon. *See* Tenn. Code Ann. § 39-13-102(a)(A), (B). A person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

*Id.* § 39-13-101(a)(1)-(3). A person acts recklessly "when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 39-11-302(c). The disregard of the risk must "constitute[] a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.*

-13-

Reviewing the evidence in the light most favorable to the state, we conclude that the evidence was sufficient to support the defendant's convictions. The evidence revealed that the defendant, by his own admission, intentionally fired a revolver at Philemon despite the presence of a crowd of people. The state presented four eyewitnesses who saw the defendant fire multiple shots and who testified that no one threatened the defendant. It was uncontested that the defendant fired the shot that hit M.S. Under *Millen v. State*,[7] a defendant is guilty of first degree murder when he intentionally tries to kill one person but actually kills an unintended victim. 988 S.W.2d 164, 168 (Tenn. 1999). This court has previously held that the supreme court's reasoning in *Millen* applies to attempted second degree murder when the defendant attempts to kill one person but shoots another person. *State v. Pulliam*, M2001-00417-CCA-R3-CD, 2002 WL 122928, at *5 (Tenn. Crim. App., at Nashville, Jan. 23, 2002). Under this theory of criminal liability, the evidence that the defendant fired at Philemon was sufficient to support the defendant's conviction for the attempted second degree murder of M.S. because the defendant was aware or should have been aware that his conduct in firing at Philemon could result in the killing of another "without further conduct on [his] part." Tenn. Code Ann. § 39-12-101(a)(2). Furthermore, the evidence that the defendant fired multiple shots into a crowd of people, hitting M.S., was sufficient to support the defendant's conviction for reckless aggravated assault because the defendant was aware or should have been aware that his conduct would result in serious bodily injury, but he disregarded that risk, which was a gross deviation from the standard of care that an ordinary person would exercise. The jury resolved any conflicts in testimony in favor of the state. *See Bland*, 958 S.W.2d at 659.

As for the defendant's self-defense theory, the state presented the testimony of witnesses who said that Philemon was not armed at the time of the shooting and that no one threatened the defendant. Also, the defendant did not present any evidence to corroborate his testimony of an immediate threat. The jury, as was their prerogative, chose not to credit the defendant's theory of self-defense, and we will not second-guess the factual determinations of the jury. Accordingly, we conclude that the evidence was sufficient to support the defendant's convictions, and he is not entitled to relief on this issue.

### III. Merger

Although not raised by the defendant, his convictions for attempted second degree murder and reckless aggravated assault must be merged. Attempted second degree murder is committed when the defendant knowingly acts with the intent to kill and believes his

___

[7] In this case, the Tennessee Supreme Court ruled that Tennessee's first degree murder statute did not require the application of the common law doctrine of transferred intent because the statute does not require proof that the defendant intended to kill a specific victim. *Millen v. State*, 988 S.W.2d 164, 168 (Tenn. 1999).

conduct will cause the death without further action. *Id.* § 39-12-101(a)(2). Reckless aggravated assault is an assault committed recklessly, which causes serious bodily injury to the victim or is committed with the use or display of a deadly weapon. *Id.* § 39-13-102(a)(1). Thus, attempted second degree murder requires an intent to kill; reckless aggravated assault does not. Reckless aggravated assault requires an assault with a deadly weapon, or an assault which causes serious bodily injury; whereas, attempted second degree murder requires neither. Therefore, the statutory elements of the two offenses are different.

However, the evidence used to prove both offenses was the same – the defendant's shooting of M.S. Moreover, the purpose of both statutes is to prevent physical harms to persons. Weighing each of these factors, we conclude that the defendant's convictions for attempted second degree murder and reckless aggravated assault are the same for double jeopardy purposes because they were part of one discrete act of conduct. Accordingly, we modify the judgments of conviction to reflect merger of the defendant's conviction for reckless aggravated assault into his conviction for attempted second degree murder.

## Conclusion

Based on the foregoing reasons, we modify the judgments of the trial court to reflect the merger of the defendant's conviction for reckless aggravated assault into his conviction for attempted second degree murder. We affirm the trial court's judgments in all other respects and remand for entry of corrected judgment sheets.

_____
J.C. McLIN, JUDGE